STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant ERAZO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19–430 RS |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | **Court:** Courtroom 3, 17th Floor |
| JOSUE ERAZO, | **Hearing Date:** December 2, 2020 |
| Defendant. | **Hearing Time:** 2:00 p.m. |

**INTRODUCTION**

Josue Erazo, a 23-year-old[1] young man with no prior criminal record, comes before this Court for engaging in street-level drug activity related to a $13 sale of crack cocaine to an undercover officer. The dangerous and impoverished environment in Honduras, coupled with a generations-long family feud that he feared would claim his life as it had several of his relatives, had led him to the U.S. in the first place when he was just a teenager. When this incident occurred, Mr. Erazo had been struggling to earn enough money not only to support himself but also to send back to Honduras to help financially support his family members who remained there. His employment was unstable, however, resulting in his regrettable and desperate decision to resort to dealing drugs on the street to make money. Subsequent to the conduct in the instant case, Mr. Erazo was able to obtain a steady, legitimate job as a welder with a company based in Atlanta. From that point forward, he did not have any new contacts with the criminal justice system. By the time of his sentencing hearing, he will have spent just over three months in custody—a significant and substantial punishment for someone who has never been in jail before. Furthermore, he faces draconian immigration consequences as a result of this conviction. Even though this case constitutes his one and only criminal conviction, that is enough to lead to not only his deportation back to Honduras, but also to ineligibility for numerous avenues of relief in immigration proceedings and permanent inadmissibility to the United States in the future. Before his near-certain deportation, he will serve additional time in immigration custody, the length of which is unknown.

Mr. Erazo takes responsibility for his actions and understands that he must face consequences for what he has done. He respectfully requests that the Court vary downwards and impose a sentence of time served—effectively three months. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

---

[1] The modified PSR indicates that Mr. Erazo is 26 years old and that his birthday is April 30, 1994. *See* Presentence Report ("PSR") at 3. His birthday is actually September 30, 1997, and he is currently 23 years old.

1

**ARGUMENT**

2

**I.    A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

3

4         In sentencing Mr. Erazo, this Court must consider all of the directives set forth in 18 U.S.C. §

5    3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United*

6    *States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

7    overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

8    necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

9    2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

10   offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

11   adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

12   and (6) provide the defendant with needed educational or vocational training, medical care, or other

13   correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

14   directs the Court to consider additional factors, including: the nature and circumstances of the

15   offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of

16   sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

17   Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

18   3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

19         Pursuant to the plea agreement in this matter, the parties have agreed to a final offense level of

20   10. Mr. Erazo agrees that his Criminal History Category is I. *See* PSR ¶ 7. The resulting advisory

21   Guidelines range is 6–12 months.

22         **A.    The nature and circumstances of the offense**

23         Mr. Erazo was arrested as part of the government's Federal Initiative for the Tenderloin

24   ("FITT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve

25   relatively minor drug offenses that normally would be prosecuted only at the state level. Along those

26   lines, Mr. Erazo was arrested following his sale of $13 worth of crack cocaine to an undercover San

27   Francisco Police Department ("SFPD") officer. When he was arrested, additional controlled

28

DEF'S SENT. MEM.
*ERAZO*, CR 19–430 RS

1   substances were also found on his person.[2] This offense was a quintessential street-level drug sale

2   that did not involve violence, weapons, threats, or other aggravating factors. When placed in

3   perspective, Mr. Erazo's offense is relatively minor, and accordingly does not warrant additional time

4   in custody beyond that which he has already served.

5       Mr. Erazo filed no motions in the case, and agreed to enter into a plea agreement within two

6   weeks of his initial appearance. The Court should take into consideration such timely and

7   extraordinary acceptance of responsibility.

8       **B.     The history and characteristics of Mr. Erazo[3]**

9           1. Mr. Erazo's personal background

10      Mr. Erazo was born in Tegucigalpa, the capital city of Honduras, but spent most of his

11  childhood in a small town outside the city. His father passed away from an illness when Mr. Erazo

12  was only nine months old, and he spent much of his childhood wishing that his father was still alive.

13  Mr. Erazo and his two half-sisters were raised by their mother and maternal grandparents; the six of

14  them shared a small two-room house. Mr. Erazo's grandfather became his father figure during his

15  upbringing. He did not have much contact with his deceased father's side of the family and they did

16  not provide his mother with any financial support to help raise him. Mr. Erazo's mother worked at a

17  clothing factory and his grandfather worked in the fields to earn money for the family. They lived a

18  subsistence lifestyle and Mr. Erazo remembers numerous occasions when he did not have food,

19  clothing, or other basic necessities because his grandfather could not find work. They lived most of

20  the time without access to electricity or running water, which was only available every five days.

21  Because of the family's financial struggles, Mr. Erazo began working in the fields when he was only

22  seven years old. What this means is that when he was still in elementary school, he was already

23  working in the fields—a physically demanding job that takes great toll on the bodies of healthy

24  adults, let alone on those of young children like Mr. Erazo.

25

26

27  [2] As noted in the PSR, these substances were fentanyl, crack cocaine, heroin, and methamphetamine.
    PSR ¶ 15. The exact net weights are unknown.

28  [3] Because of expedited sentencing in this matter, there was no presentence interview. To assist the
    Court in its determination of an appropriate sentence, undersigned counsel will include in this section
    information normally obtained in a presentence interview.

DEF'S SENT. MEM.
*ERAZO*, CR 19–430 RS

4

On top of Mr. Erazo's family's financial difficulties, they also had to deal with a long-standing feud with another family that lived in the same town. The bad blood between the two families dates back generations and Mr. Erazo is unaware of what caused the problems to start in the first place. Whatever the genesis may have been, the feud escalated to the point where his cousin and uncle were both murdered by members of the opposing family. His uncle's murder occurred before Mr. Erazo was born and his cousin's murder occurred around the time that Mr. Erazo first came to the U.S. in 2013. He was only a teenager at the time, but felt compelled to make the treacherous journey to the U.S. on his own not only in search of opportunities to make money but also to remove himself from the volatile and potentially deadly circumstances stemming from this family feud.

Once in the U.S., Mr. Erazo spent two and a half years living in Chicago before moving to Oakland. One of his half-sisters lives in Oakland as well, and they worked at a car wash together. It was during his years in Oakland that he found himself struggling to make enough money to support himself while also feeling enormous pressure to send money back home to his relatives in Honduras. When he was not able to sustain stable employment, he fell victim to the desperate need to make quick money and began dealing drugs on the street. This poor decision is what led to the conduct that brings him before this Court. In the late summer of 2019, Mr. Erazo's work prospects improved significantly when he began working as a welder for a company based in Atlanta. He ended up moving to Atlanta for that job shortly thereafter, and spent much of the last year there. While in Atlanta, Mr. Erazo lived with his girlfriend and their newborn baby, who is now five months old. Most recently, his work took him to New York, where he ultimately was arrested on an outstanding warrant from San Francisco County. Notably, once he began his welding job, he stopped engaging in drug-related activities and did not incur any arrests for new criminal conduct.

By his sentencing date, Mr. Erazo will have been in custody for just over three months.[4] For a 23-year-old who has never spent time in jail before, three months is a lifetime, particularly during the COVID-19 pandemic that has spread worldwide this year. Since the inception of the pandemic in

---

[4] He was arrested on the state warrant on August 28, 2020, as noted in the PSR. He was in continuous state custody until his transfer to federal custody on October 2, 2020. State charges were dismissed shortly thereafter.

1    March, this Court has no doubt become extremely familiar with the susceptibility of correctional

2    facilities to widespread COVID-19 outbreaks. Reducing the jail population density by imposing time-

3    served sentences where appropriate, such as in the instant matter, would protect not only Mr. Erazo,

4    but also the community at large. *See* Jean Casella & Katie Rose Quandt, *US Jails Will Become Death*

5    *Traps in the Coronavirus Pandemic*, THE GUARDIAN (March 30, 2020, 10:12 AM).[5]

6         All Mr. Erazo wants to do at this point is return to Honduras where he can continue to

7    financially support his family and avoid any further involvement with criminal conduct. He plans to

8    use the skills that he has obtained from his work experience here in the U.S. and intends to pursue

9    work in construction and welding. Crucially, he understands that returning illegally to the U.S. would

10   only result in longer jail sentences and he wants no part of that. Mr. Erazo has learned his lesson and

11   he has learned it well; imposing a sentence that would keep him in jail during a pandemic would

12   serve no additional purpose and would be overly punitive.

13                          2. Immigration consequences for Mr. Erazo

14        It is almost certain that Mr. Erazo will be deported following resolution of the instant matter.

15   Because of the nature of the charge, this conviction will trigger draconian immigration penalties

16   beyond deportation. Almost every avenue for relief that he otherwise would be able to pursue as a

17   potential defense in immigration proceedings will no longer be available to him. Most severely, Mr.

18   Erazo will be rendered permanently inadmissible to the United States, meaning that he will be barred

19   from re-entry for the rest of his life. Finally, before his deportation, he will spend an uncertain period

20   of time in immigration detention—a time period that could easily stretch to a month or more—which

21   will serve as an additional custodial consequence of his conduct.[6]

22                          3. Conditions in Honduras

23        As set forth above, Mr. Erazo came to the United States from Honduras in part because there

24   was no realistic opportunity of gainful employment there. Although this fact does not excuse Mr.

25   Erazo's criminal conduct, it does provide an important perspective, especially when considering the

26

27   ─────────────────────

28   [5] Available at https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island.
     [6] An ICE detainer has already been lodged against Mr. Erazo. PSR at 2.

DEF'S SENT. MEM.
*ERAZO*, CR 19–430 RS

6

1  role in creating those violent conditions in Honduras played by the same federal government

2  prosecuting him here.

3       Honduras is a dangerous and violent country with one of the highest murder rates in the world.

4  *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter

5  2018 Crime & Safety Report][7]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in

6  Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not

7  at war.").[8] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center,

8  are two of the ten most dangerous cities in the world.[9] Central America Refugee Crisis, U.N.

9  REFUGEE AGENCY[10]; *see also* Gangs in Honduras at 1. Violence in Honduras includes "homicide,

10  extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country

11  Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF

12  DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[11]

13       Although there are many reasons for the high crime and murder rates, political instability and

14  gang activity have contributed to the violence for decades. In the 1980's, the United States used

15  Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.*

16  Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries

17  unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal

18  groups began to form throughout Central America. *Id.* According to the Wilson Center, crime

19  generally goes unreported because of corruption, weak law enforcement, and active criminal groups.

20  *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON

21  CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[12] In 2009, a military coup ousted

22  Honduras President Zelaya making Honduras the first Central American country to undergo a coup in

23

24  _____

25  [7] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
    [8] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.

26  [9] Mr. Erazo's hometown is 1–2 hours away from Tegucigalpa.
    [10] Available at https://www.unrefugees.org/emergencies/central-america/.

27  [11] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.

28  [12] Available at
    https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.

DEF'S SENT. MEM.
*ERAZO*, CR 19–430 RS

nearly two decades, and in 2017, the Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017).[13] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and demonstrate why many people such as Mr. Erazo are fleeing in hopes of creating safer and more sustainable lives.

### C.    The need to avoid unwarranted sentencing disparities

A time-served sentence would avoid unwarranted disparities with defendants in strikingly similar cases arising from the FITT. This becomes especially apparent when one looks at the circumstances of cases ending in a time-served sentence where the defendants had a more extensive criminal or deportation history than in the instant matter. The following cases are illustrative:

- *United States v. Jesus Flores*, CR 19-429 SI. Mr. Flores was arrested for a $15 drug sale. Officers found $932 cash and other drugs on him, including 56 grams of cocaine base, 38.2 grams of heroin, 32.5 grams of methamphetamine, and 31.1. grams of marijuana (gross weights). He had been deported twice in the past. Mr. Flores' Guidelines range was 10–16 months. Judge Illston sentenced him to time served (effectively four months).

- *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of a $17 heroin sale. His Guidelines range was 8–14 months. Mr. Cabrerra's record was far more serious than Mr. Erazo's, as it included three prior convictions for drug sales— including one that resulted in a four-year prison sentence—and six deportations. Judge Orrick sentenced him to time served (effectively four months).

- *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16 crack cocaine sale. He was on probation at the time of the offense, and faced a Guidelines range of 8–14 months with an offense level of 10 and a Criminal History

---

[13] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.

Category of II. Judge Orrick sentenced him to time served (effectively one month).

- *United States v. Ristir Trejo*, CR 19-535 RS. Mr. Trejo faced charges stemming from four different drug sales, including fentanyl, over a period of 15 months. His record included a prior misdemeanor drug conviction as well as a prior federal misdemeanor conviction for illegal entry. His Guidelines range was 21–27 months, significantly higher than Mr. Erazo's range. This Court sentenced Mr. Trejo to time served (effectively 6 ½ months).

- *United States v. Jose Ramos-Varela*, CR 19-713 EMC. Mr. Ramos-Varela was arrested for a $20 methamphetamine sale, and additional heroin was recovered from his person when he was arrested. He had one prior deportation that occurred subsequent to a prior felony drug conviction. His Guidelines range was 10–16 months. Judge Chen sentenced him to time served (effectively two months).

## CONCLUSION

For all the reasons set forth above, Mr. Erazo respectfully requests that the Court impose a sentence of time served. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).


Dated:      November 25, 2020                    Respectfully submitted,

                                                 STEVEN G. KALAR
                                                 Federal Public Defender
                                                 Northern District of California

                                                      /S
                                                 ANGELA CHUANG
                                                 Assistant Federal Public Defender

DEF'S SENT. MEM.
*ERAZO*, CR 19–430 RS

9